United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. C 05-0194 CW

PAUL ALBERT GUARDADO,

        Petitioner,

   v.

MARGARITA PEREZ, et al.,

        Respondents.
_____/

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

    On January 12, 2005, Petitioner Paul Albert Guardado, a state prisoner incarcerated at the Correctional Training Facility at Soledad, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petition is directed to a denial of parole by the Board of Prison Terms[1] (Board).  The Court ordered Respondent to show cause why the writ should not be granted.  On July 17, 2007, Respondent filed an answer and lodged a copy of the records of the state proceedings.  Petitioner timely filed a traverse.  For the reasons set forth below, the petition is granted and the matter is remanded to the Board to reevaluate Petitioner's

---

[1] The Board of Prison Terms was abolished effective July 1, 2005 and replaced with the Board of Parole Hearings.  Cal. Penal Code § 5075(a).

suitability for parole.

## BACKGROUND

I. Facts

The California Court of Appeal, in affirming Petitioner's conviction of second degree murder, described the following facts:

> On the night of February 24, 1979, a group of youths, including Guardado, Ramirez, Vincent Orozco, Kim Arganda, Manuel Ybarra, Corina Ribota and Ralph Ponce, gathered in Westminster's Sigler Park. At about 10 p.m., Ybarra drove Guardado, Orozco and Arganda to a nearby liquor store. On the way back, rear passengers Guardado and Orozco asked for their handguns. Arganda and Ybarra retrieved the guns from under the front seat and passed them back. Guardado suggested they stop and assault people they passed, saying, "I don't like the way that person looks . . . let's get him." Rather than stopping, Ybarra returned to the park.
> At 11:30 p.m., Steven Buus walked through the park wearing a black hat. Ribota pointed him out to the others, saying, "I want that hat." Some of the youths, including Guardado, Orozco and Ramirez, ran to Buus and began beating and kicking him. Then, Guardado, Orozco and others encircled Buus while Ramirez kicked him some more. As Buus lay on the ground, Ribota took his hat, tried it on and then tossed it away.
> After turning away from the scene, Ribota heard a gunshot. She looked back and saw Guardado, Ramirez and Orozco standing over Buus. Guardado was holding a gun and Buus was begging for his life. Ramirez then drew a sawed-off shotgun from beneath his coat and shot Buus in the heart.
> Buus' autopsy revealed he was shot three times. One small-caliber bullet was fired into his back from close range. The bullet was too fragmented to be identified. A .22-caliber bullet was fired into Buus' chest on the left side, causing injuries which would have been fatal without medical treatment. It could not be determined whether these two shots were fired from the same gun. The shotgun blast destroyed Buus' heart. He also had head injuries from the beating, which would have killed him if left untreated.
> No one came forward with any information

> about the shooting until 1984, when Ribota, hoping to collect a reward, gave a detailed interview to authorities. The police arrested Guardado in 1988, when he was 26 years old.
>
> At trial, Guardado claimed Ponce was the one who shot Buus before Ramirez finished him off with the shotgun. Guardado admitted having a gun during the trip to the liquor store but said he left it in Ybarra's car when they returned to the park. Orozco testified he took his gun (a .22) from the car but eventually gave it to Ponce, who shot Buus.

People v. Guardado, No. G-017962, slip op. at 2-3 (Cal. App. 4th 1997).

At his 2006 parole hearing, the Board described Petitioner's recent prison record:

> You remained assigned to the vocational print shop. You received a laudatory chrono dated June 18, '04 noting the exceptional talent and valuable skills as a graphic artist. It says you designed IST bulletin covers, institution posters and you were considered a valuable asset and a peer trainer. There was no academics during this period. It says that you participated in AA based on various chronos. You also participated in the Children's Festival, Christmas Festival and it says apparently you designed many of the decorations. These are listed on the chrono. And in February 6, '04 you completed a three week Anger Management program Cage Your Rage. It also says here that you also received recognition for Legal Services For Prisoners With Children Seminar based on a chrono from June '05. There was no psychiatric treatment, no discipline. And the counselor writes here that: "Guardado has programmed very well and continues to do well with both staff and peers." . . . I got an Anger Management program, a 12-week program through the Protestant Chapel in December '05. . . . And you also took the Anger Management video series Healing For the Angry Heart, February 6.

Resp't Ex. 7 at 39-41.

The Board continued:

> What I noted is that you completed the vocational graphic arts program in '03. And you also completed the Paralegal Institute Associate Degree Program for paralegal studies in '98. That was in the vocational areas. In terms of skills that you could carry outside, I noted that some of the other jobs you've held, and I'm not going to go over all of them, point out that you have stayed busy and you've had good reports in textiles. You've held various clerical positions. You've been a porter. Got your GED through the Jobs Corps in 1980. . . . You've done the various HIV, TB, AIDS, STD's etcetera in 2000. You did the 30-hour Parenting program through Friends Outside in 2000. And the Path to Peace, '02. That was a 12-week program. Addiction Recovery program, I think that was the one of the Islam programs. . . . Disciplinaries, you've had one 115. That was for mutual combat. That was October 21, '98. One 128, April 14, '93 for not having clean living quarters and clothing. . . . It is commendable. There hasn't been any violence since '98. And I want to point that out.

Resp't Ex. 7 at 43-45.

II. Procedural History

In 1988, Petitioner was found guilty of second degree murder with use of a firearm and was sentenced to seventeen years to life (fifteen years for second-degree murder and two years for the firearm). Petitioner was received in prison on November 16, 1989, and his life term began on July 4, 1990. In 1994, the Ninth Circuit granted Petitioner's writ of habeas corpus, reversed the trial court's judgment, and remanded his case for re-trial. Guardado v. Stainer, No. 92-56190, slip op. at 2 (9th Cir. 1994).

Upon retrial, Petitioner was again convicted of second-degree murder with use of a firearm. He received a seventeen years to life sentence (fifteen years for second-degree murder and two years for the firearm). The state court of appeal affirmed the

4

1  conviction. People v. Guardado, No. G-017962, slip op. at 1 (Cal.
2  App. 4th 1997).
3      Since 2002, Petitioner has been denied parole four times.  In
4  2002, 2003 and 2004, the Board found that Petitioner was unsuitable
5  for parole based on the commitment offense, which was carried out
6  in a cruel and callous manner and demonstrated callous disregard
7  for human suffering.  Resp't Ex. 4 at 80; Resp't Ex. 5 at 67;
8  Resp't Ex. 6 at 81.  Each time, the Board also found that the
9  victim was abused during the murder and that the motive for the
10 crime was inexplicable.  Id.  The Board found that Petitioner
11 needed to learn how to deal with stress in a non-destructive
12 manner.  Resp't Ex. 4 at 82; Resp't Ex. 5 at 71; Resp't Ex. 6 at
13 85.  In 2002 and 2003, the Board noted that Petitioner had a stable
14 social history.  Resp't Ex. 4 at 81, Resp't Ex. 5 at 69.  In 2004,
15 however, the Board described Petitioner's social history as
16 unstable based on the same information it had before it in 2002 and
17 2003.  Resp't Ex. 6 at 83.  In 2003, the Board found for the first
18 time that Petitioner's criminal record showed an escalating pattern
19 of violence.  Resp't Ex. 5 at 68.  Petitioner was convicted of
20 malicious mischief to a vehicle in violation of Cal. Vehicle Code
21 § 10853 in 1979 and of driving under the influence of alcohol in
22 1982, both after he had committed the commitment offense, but
23 before he was apprehended for it.  Resp't Ex. 4 at 81.  In 2004,
24 based on the same record, the Board found instead that Petitioner
25 had an escalating pattern of "contact with law enforcement
26 agencies."  Resp't Ex. 6 at 83.
27     After each denial, Petitioner filed a petition for writ of
28 habeas corpus in the Orange County Superior Court.  The court

5

denied his petitions and found that the facts of the murder provided some evidence to support the Board's decision. <u>In re Guardado</u>, No. M-9845, slip op. at 3 (Cal. Super. Ct. 2003); <u>In re Guardado</u>, No. M-10347, slip op. at 2 (Cal. Super. Ct. 2005); <u>In re Guardado</u>, No. M-10506, slip op. at 5 (Cal. Super. Ct. 2005). Upon each denial, Petitioner filed a petition for writ of habeas corpus with the California appellate court and California Supreme Court; both summarily denied his petitions. <u>In re Guardado</u>, No. G-032023, slip op. at 1 (Cal. Ct. App. 4th 2002); <u>In re Guardado</u>, No. S-120982, slip op. at 1 (Cal. 2004); <u>In re Guardado</u>, No. H-028442, slip op. at 1 (Cal. Ct. App. 6th 2005); <u>In re Guardado</u>, No. S-131931, slip op. at 1 (Cal. 2005); <u>In re Guardado</u>, G-035509, slip op. at 1 (Cal. Ct. App. 4th 2005); <u>In re Guardado</u>, S-135618, slip op. at 1 (Cal. 2005).

In 2006, the Board found that Petitioner was unsuitable for parole based on the commitment offense and his lack of insight and understanding of his part in the murder. Resp't Ex. 7 at 98. Referring to Petitioner's account of the crime, the Board stated, "We just simply don't find you believable." <u>Id.</u> at 99. The Board continued by asking Petitioner, "[I]f you have no insight into your behavior, how can you correct it?" <u>Id.</u> The Board concluded that nothing indicated that Petitioner had come to terms with the fact that he was a participant in the crime, <u>id.</u> at 101, and that he "absolutely didn't demonstrate any remorse whatsoever," <u>id.</u> at 104. The Board commended Petitioner on his progress in programs and the "tremendous amount of work" he did while in the institution. <u>Id.</u> at 100, 105. In closing, the Board stated it was "very, very concerned for public safety" and considered Petitioner "one of the

6

most dangerous people the State could have." Id. at 104.

Petitioner filed a petition for writ of habeas corpus in the Orange County Superior Court challenging the Board's 2006 decision. In re Guardado, No. M-11035, slip op. at 3 (Cal. Super. Ct. 2006). The court denied his petition and found that the Board's decision was supported by some evidence. Id. The court found that the Board pointed to the facts of the commitment offense, which exceeded the minimum elements necessary for the crime. Id. The court never reached Petitioner's claim that the Board's continuous use of the commitment offense to deny parole violated due process. Id. at 4. Petitioner filed his petition for a writ of habeas corpus in the California appellate court and the California Supreme Court; both summarily denied his petitions. In re Guardado, No. G-037843, slip op. at 1 (Cal. Ct. App. 4th 2007); In re Guardado, No. S-149934, slip op. at 1 (Cal. 2007).

Petitioner filed three separate federal habeas corpus petitions challenging the Board's 2002, 2003, 2004 decisions. On March 8, 2006, the three petitions were consolidated into this case. On September 20, 2006, the Court granted Petitioner's motion for appointment of counsel. On May 15, 2007, the Court consolidated into this case Petitioner's fourth habeas corpus petition challenging the Board's 2006 decision.

DISCUSSION

I. Standard of Review

The petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply. Lindh v. Murphy, 521 U.S. 320, 327 (1997); McQuillion v. Duncan, 306 F.3d 895, 901 (9th

7

Cir. 2002).

Under the AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, Williams, 529 U.S. at 407-09, while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application

8

must be "objectively unreasonable" to support granting the writ. See id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340. A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. Id. Although only Supreme Court law is binding on the States, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

II. Analysis

The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)). When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability

9

determinations in the relevant State.  Id.  Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle.  Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . ."  Cal. Penal Code § 3041(b).

The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is required to consider.  See 15 Cal. Code Regs. § 2402(b).  These include "[a]ll relevant, reliable information available," such as,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner

10

committed the offense in an especially heinous, atrocious or cruel manner." Id. at (c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id.

Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. Id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. Id. at (d).

Respondents argue that California inmates do not have a federally protected liberty interest in parole release and that the Ninth Circuit's holding to the contrary in Sass, 461 F.3d at 1128, is not clearly established federal law for the purposes of AEDPA.

11

However, this Court is bound by Ninth Circuit authority.

Respondents next contend that even if California prisoners do have a liberty interest in parole, the due process protections to which they are entitled by clearly established Supreme Court authority are limited to an opportunity to be heard and a statement of reasons for denial. This position, however, has likewise been rejected by the Ninth Circuit, which held in Irons that a prisoner's due process rights are violated if the Board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." The "some evidence" standard identified is thus clearly established federal law in the parole context for purposes of § 2254(d). See Sass, 461 F.3d 1128-1129.

The Board explained that it based its denial primarily on the commitment offense. It is undeniable that the offense was heinous, atrocious and cruel, demonstrating a callous disregard for human suffering. These facts will never change. However, the Ninth Circuit has held that continuous reliance over time on static factors such as the commitment offense could violate due process. See Hayward v. Marshall, 512 F.3d 536, 545 (9th Cir. 2008); Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007); Sass, 461 F.3d at 1129; Biggs v. Terhune, 334 F.3d 910, 916-917 (9th Cir. 2003). The Ninth Circuit has not specified the number of denials or the length of time served beyond the minimum sentence that would constitute a due process violation, but Petitioner has served more than his minimum sentence and has been denied parole by the Board five times. The question is whether it is reasonable to find after almost thirty years that the facts of the offense constitute some evidence that Petitioner would be a danger to society if released.

12

1    Other evidence before the Board weighed against a finding that
2 Petitioner is currently dangerous.  Both Petitioner's 1999 and 2004
3 psychological reports conclude that Petitioner's violence potential
4 if released into the community is "no more than the average citizen
5 in the community."  Pet'r Att'y Decl. Ex. B-1 at 5; Ex. D-1 at 3.
6 The 1999 report, which was before the Board at all of his hearings,
7 stated that his "prognosis for successful community living is
8 good."  Pet'r Att'y Decl. Ex. B-1 at 3.  Petitioner's 2002 Life
9 Prisoner Evaluation Report stated that Petitioner would pose a
10 moderate degree of threat to the public if released from prison.
11 Pet'r Att'y Decl. Ex. B-2 at 1.  His 2003 Life Prisoner Evaluation
12 Report stated, "Considering the commitment offense, prior record
13 and prison adjustment, this writer believes that the prisoner would
14 probably pose a low degree of threat to the public at this time, if
15 released from prison . . . I feel he has the proportionate
16 ingredients for successful reintegration into society."  Pet'r
17 Att'y Decl. Ex. C-2 at 5.  His 2004 Life Prisoner Evaluation Report
18 stated that he "has evolved into a rational, responsible and
19 insightful person and I believe if he was released from prison, he
20 would pose no more than a low degree of threat to the public."
21 Pet'r Att'y Decl. Ex. D-2 at 2.

22    The only other factors the Board cited for its conclusion that
23 Petitioner remained dangerous were what it called his lack of
24 insight, Resp't Ex. 7 at 98, and lack of remorse, id. at 104.  It
25 appears that the Board equated Petitioner's lack of insight with
26 his denial that he was the shooter.  The Board explained:

27        I'm troubled by the way by the fact that
          Justice Caudill's letter to the Governor states
28        factors that involve your case that are unusual

13

> and it says that "even though he was 17 years
> of age when the crime was committed and he was
> convicted on the theory of aiding, abetting the
> individuals who actually committed the crime"
> and you were convicted of second degree murder
> with the use of a firearm twice, even after the
> first Appellate decision upheld the hearsay
> issue.  That concerns me.  I don't think you
> are necessarily being straightforward and
> honest with anyone. . . .  And we accept the
> findings of the court to be true and we refer
> to the Appellate decision.  And therefore, we
> have to make a comparison in order to establish
> insight.  And we don't feel like you have any.

Id. at 102-03.  However, the California Penal Code provides that the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Cal. Penal Code § 5011(b).  See also 15 Cal. Code Regs. § 2236 (same).  Further, the appellate court affirmed Petitioner's conviction of second-degree murder on an aiding and abetting theory.  Petitioner clearly admits his guilt of second degree murder as an aider and abettor.

The Board's finding that Petitioner's description of the crime is not believable is based on the following:

> we have looked back at some of the things you
> said and that really concern us.  They're just
> subtle things, subtle differences.  You talk of
> the fact that Ralph stepped in front of you and
> fired the weapon and that you thought that
> might be why the witness thought it was you
> that fired the weapon.  And then another time
> you talked about being at least five feet away
> when he fired the weapon.  The way you
> characterize your participation in this crime
> as I said is as if you weren't even part of the
> mix.  You stated that some times you
> participate in chasing Mr. Buus and that you
> were one of the people surrounding him.  You
> said that at other times that you simply
> followed one of your crime partners because you
> thought there was going to be a fight and you
> knew that there was going to be a fight.  This
> was certainly for one thing no fight.  This was
> a horrible, violent, disgusting, brutal attack

14

>                on an innocent young man who was incredibly
>                outnumbered and who spent the last of his life
>                in absolutely abject terror.  It was -- This
>                was a horrible crime.  And there was nothing
>                that we saw today that indicated to us that you
>                were a participant in the crime.

Resp't Ex. 7 at 100-101.  Being five feet away from Ralph and being behind him are not inconsistent.  Similarly, Petitioner's admission that he participated in chasing the victim, and his statement that he followed others to a fight with the victim are not inconsistent.

The Board was clearly incorrect in its statement that Petitioner "absolutely did not demonstrate any remorse whatsoever . . ."  Id. at 104.  Petitioner has expressed remorse for his crime and sorrow for the victim and his family.  In a 2004 letter, he states, "I cannot give Steven his life back or his family back the young man which my wrongdoing helped deprive them of.  The best I can do and will do, with God's help and yours, is give back to the community in Steven Buus' memory."  Pet'r Decl. Ex. D-2 at 3.  The sincerity of Petitioner's remorse is backed up by the evaluations of him by others, including psychologists and prison staff.  His 1999 psychological report, which was before the Board at all of his hearings, opines that he "states demonstrated understanding regarding the circumstances leading to the commitment offense and his empathy for the victim appeared to be genuine."  Pet'r Att'y Decl. Ex. B-1 at 3, 4.  His 2004 psychological report added that he "accepted responsibility for leaving the scene, and for the many years of suffering which resulted for the family of the victim."  Pet'r Att'y Decl. Ex. D-1.  Petitioner's 2003 Life Prisoner Evaluation Report stated that he "makes no excuses for his past behavior and above all he expresses a sincere heartfelt based

15

1  remorse for his part in the tragic occurrence that fateful day and
2  for the continued adverse affects it has had on the victim's family
3  and his own. . . .  He soulfully feels for all concerned and cannot
4  change what occurred.  He will forever make amends in his heart."
5  Pet'r Att'y Decl. Ex. C-2 at 5.
6       Because the Board is precluded from relying on Petitioner's
7  failure to admit a particular version of the commitment offense,
8  and because the Board was clearly wrong in its assessment that
9  Petitioner has expressed no remorse, the commitment offense is the
10 only evidence of present dangerousness.  The question remains
11 whether the commitment offense constitutes some evidence of present
12 dangerousness.
13      Petitioner demonstrates the other factors that indicate his
14 suitability for parole.  He has no juvenile record.  He has a
15 relatively minor record of convictions, which includes no
16 convictions involving violence other than the commitment offense.
17 He has expressed apparently sincere remorse, as discussed above.
18 Although the Board's findings on this point have been inconsistent,
19 he has a stable social history, evidenced by his 1999 and 2004
20 psychological reports.  Pet'r Att'y Decl. Ex. B-1 at 1; Ex. D-1 at
21 1.  He married and fathered two sons, now grown, after the
22 commitment offense but before he was arrested for it.  Petitioner's
23 present age of forty-six years suggests a reduced possibility of
24 recidivism.  He has made realistic plans for release, as evidenced
25 by letters from many members of his family indicating that they can
26 assist him with employment and housing.  Resp't Ex. 7 at 24-30.
27 Petitioner's educational achievements, including his GED, AA, and
28

Paralegal Certificate, have given him marketable skills that can be put to use on release. His institutional activities, such as rehabilitation programs and vocational and charitable work, indicate an enhanced ability to function within the law upon release.

The circumstances tending to indicate a petitioner's unsuitability for parole are not applicable to Petitioner. He has no record of convictions for violent offenses other than the commitment offense. He does not have an unstable social history. He has committed no sadistic sexual offense, he has no history of mental health problems and he has committed no serious misconduct in prison. His disciplinary history consists of one instance of mutual combat in 1998 and a failure to clean his cell in 1993.

The last reasoned state court opinion is that of the Orange County Superior Court. That court concluded that the record contained "some evidence" to support the Board's finding that Petitioner was unsuitable for parole. In re Guardado, No. M-11035, slip op. at 3. However, the state court misstated the "some evidence" test. The state court found that the Board's recitation of the facts of the crime was "some evidence" to support the Board's conclusion that the crime was "horrible," and therefore the Board was "not required to engage in further analysis." Id. at 3-4. The Ninth Circuit has explained that the "test is not whether some evidence supports the reasons the [Board] cites for denying parole, but whether some evidence indicates a parolee's release unrealistically endangers public safety" and that "some evidence of the existence of a particular factor does not necessarily equate to

17

some evidence the parolee's release unreasonable endangers public safety." Hayward, 512 F.3d at 543 (citing In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

The state court failed to note that, over time, the Board's continuous reliance upon an unchanging factor--Petitioner's commitment offense--may violate his due process right.  Here, Petitioner's crime was committed decades ago, when he was seventeen years old.  An unusual circumstance which bears on the predictive quality of the commitment offense is that Petitioner was not charged with the crime until ten years later; during that period, he was not convicted of any violent crime.  While the Board may base its denial on the gravity of the commitment offense alone, over time, this "'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.'"  Id. at 545 (quoting Biggs, 334 F.3d at 915).  As time passes, the commitment offense becomes such an unreliable predictor of a petitioner's present and future dangerousness that it does not satisfy the "some evidence" standard.  Id. at 546.  The state court did not point to any other evidence of present dangerousness.

In light of Petitioner's entire record--including his age at the time of the crime, his violence-free years before he was arrested, his lengthy incarceration, his rehabilitation through education, good conduct and charitable work--his commitment offense, which occurred twenty-nine years ago, no longer constitutes "some evidence" that his release will pose an imminent danger to public safety.  See Hayward, 512 F.3d at 546.  The Board's continued reliance upon the commitment crime alone violated

1  Petitioner's due process rights, and the state court's contrary
2  finding was an unreasonable application of Supreme Court law.

CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is GRANTED.  The Court remands to the Board to hold a new hearing within sixty days and re-evaluate Petitioner's suitability for parole in accordance with this order.  All pending motions are terminated.  A separate judgment shall issue, and the Clerk is directed to close the file.  Each party shall bear his or her own costs.

IT IS SO ORDERED.

Dated: 4/9/08

CLAUDIA WILKEN
United States District Judge