IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL ALBERT GUARDADO,

    Petitioner,

  v.

MARGARITA PEREZ et al.,

    Respondents.

                             /

No. C 05-00194 CW

ORDER GRANTING PETITIONER'S APPLICATION FOR ORDER ENFORCING WRIT OF HABEAS CORPUS

    Petitioner Paul Albert Guardado applies for an order enforcing the Court's April 9, 2008 Order granting his petition for a writ of habeas corpus. Respondents have opposed the application. The Court took the matter under submission. Having considered all of the papers filed by the parties, the Court grants the application and remands to the Board to submit its decision, along with this Court's opinions, for review by the Governor.

                                  BACKGROUND

I. April 9, 2008 Order

    Petitioner filed three separate federal habeas corpus petitions challenging the 2002, 2003, 2004 denials of parole by the

Board of Prison Terms[1] (Board).  On March 8, 2006, the three petitions were consolidated into this case.  On May 15, 2007, the Court consolidated into this case Petitioner's fourth habeas corpus petition challenging the Board's 2006 decision.  On April 9, 2008, this Court issued an Order Granting Petition for Writ of Habeas Corpus.  In the April 9 Order, the Court stated the following.

> The Board explained that it based its denial primarily on the commitment offense.  It is undeniable that the offense was heinous, atrocious and cruel, demonstrating a callous disregard for human suffering.  These facts will never change.  However, the Ninth Circuit has held that continuous reliance over time on static factors such as the commitment offense could violate due process.  (Citations omitted). . . Petitioner has served more than his minimum sentence and has been denied parole by the Board five times.  The question is whether it is reasonable to find after almost thirty years that the facts of the offense constitute some evidence that Petitioner would be a danger to society if released.

April 9, 2008 Order at 12.

The Court addressed the evidence that weighed against a finding that Petitioner was currently dangerous and noted that his 1999 and 2004 psychological reports concluded that his violence potential if released in the community was not more than the average citizen and that his prognosis for successful community living was good.  Id. at 13.  One of the most compelling factors supporting a finding that Petitioner is not a danger to public safety is the fact that he had lived in the community for ten years before being charged with the commitment offense and during that time was not convicted of any violent crime.  Id. at 18.  Also, Petitioner has no juvenile record, a relatively minor record of convictions, and a stable social history.  He has expressed sincere

---

[1] The Board of Prison Terms is now the Board of Parole Hearings.  Cal. Penal Code § 5075(a).

1 remorse.  During his incarceration he has made educational
2 achievements that have given him marketable skills and has been
3 involved in rehabilitation programs and charitable work which
4 indicate he has an enhanced ability to function within the law upon
5 release.  Id. at 16.  Furthermore, he has made realistic plans for
6 release.  Id.  The Court also noted that none of the factors
7 tending to indicate a prisoner's unsuitability for parole were
8 present in Petitioner's case.  Id. at 17 (listing unsuitability
9 factors).

10     In the Order, the Court noted that the only factor other than
11 the commitment offense relied on by the Board was what it called
12 his "lack of insight" and "lack of remorse."  Id. at 13.  The Court
13 pointed out that under California Penal Code § 5011(b), the Board
14 may not require an inmate to admit guilt to any crime for which the
15 inmate was committed, and that the Board had improperly equated
16 Petitioner's denial that he was the shooter with a lack of insight.
17 Id. at 13-14.  The Court concluded that the Board was incorrect in
18 its statement that Petitioner did not demonstrate any remorse
19 whatsoever, noting that the record showed that Petitioner had
20 expressed remorse for the crime and sorrow for the victim and his
21 family.  Id. at 15.

22     The Court also concluded that the state court opinion
23 affirming the Board's decision had misstated the "some evidence"
24 test and, thus, its finding that Petitioner's due process rights
25 had not been violated was contrary to and involved an unreasonable
26 application of Supreme Court authority.  Id. at 18-19.  The Court
27 remanded to the Board to hold a new hearing and to re-evaluate
28 Petitioner's suitability for parole in accordance with the Court's

3

order.  Id. at 19.

II. The Board's August 12, 2008 Decision

On June 4, 2008, the Board began a hearing on Petitioner's suitability for parole and continued it to August 12, 2008, when it issued its decision.  The Board again found Petitioner "not yet suitable for parole" and that Petitioner "would pose an unreasonable risk or danger to society or a threat to public safety if released from prison."  August 12, 2008 Decision at 60.

The Board gave the following reasons for its decision: "the commitment offense was carried out in an especially cruel and callous manner," id. at 60, the motive for the offense was trivial, id. at 62, and an April 29, 2008 psychological report by Dr. Richard Starrett was not totally supportive of release, id. at 64.  However, the Board gave the greatest weight to its finding that Petitioner had only recently gained insight into his responsibility for the commitment offense.  Id. at 60:19-20, 62:5-63:7, 65:8-24.

DISCUSSION

Respondents oppose Petitioner's motion on several grounds: (1) the Board complied with the Court's April 9, 2008 Order by holding a parole suitability hearing for Petitioner within sixty days from the date of the Order; (2) before this Court may review the Board's August 12, 2008 decision, Petitioner's claims must be presented to the state's highest court to exhaust his state remedies; and (3) the Board's decision was substantively in compliance with the April 9, 2008 Order.

I. Holding a Hearing

The Court did not merely instruct the Board to hold a hearing within sixty days; it instructed the Board to hold a hearing in

4

accordance with the Court's order. The fact that the Board held a hearing within sixty days of the Order is insufficient, by itself, to demonstrate that it complied with the findings in the Order. Therefore, this ground for denying Petitioner's motion is rejected.

II. Exhaustion

Respondents cite federal authority requiring that state prisoners seeking habeas relief in federal court must first exhaust their remedies in state court by presenting the highest state court a fair opportunity to rule on the merits of each issue they seek to raise in federal court. Respondents argue that Petitioner's application must be denied because he is attempting to circumvent the state courts in bringing this motion directly to this Court.

Respondents incorrectly characterize Petitioner's application. Ordinarily, a federal habeas petition requires a federal court to examine a state court opinion to determine if it was contrary to, or involved an unreasonable application of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See April 9, 2008 Order at 8 (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). A federal habeas petition directed at the Board's finding of unsuitability for parole is the last step in the habeas procedure after the highest state court has examined the constitutionality of the Board's proceedings. However, Petitioner's application is not a new habeas petition, but is directed at the Board's compliance with this Court's order. Therefore, this ground for denying Petitioner's motion is rejected.

5

III. Substantive Compliance with Court Order

Respondents argue that even if this Court reviews the substance of the Board's decision for compliance with the April 9, 2008 Order, it must find that the Board complied. The Court finds that the Board failed to re-evaluate Petitioner's suitability for parole in accordance with its order.

The recitation by the Board of factors present before or at the time of the commitment offense are repetitive of the reasons the Board gave at the 2006 hearing, which the Court found were improper grounds for finding parole unsuitability because, under the circumstances here, the Board's continued reliance over time on static factors such as the commitment offense violated Petitioner's due process rights. April 9, 2008 Order at 12 (citing Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007); Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1129 (9th Cir. 2006); and Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003)). The Court stated, "In light of Petitioner's entire record . . . his commitment offense, which occurred twenty-nine years ago, no longer constitutes 'some evidence' that his release will pose an imminent danger to public safety." Id. at 18. Thus, the Board may no longer rely on static factors such as the commitment offense, the trivial motivation for the offense, or Petitioner's participation in street gangs when he was a teenager. See Transcript of August 12, 2008 Hearing at 61, 63. These factors do not constitute some evidence of Petitioner's danger to public safety.[2]

---

[2] The Board also listed the fact that Petitioner had an unstable social history. See Transcript of August 12, 2008 Hearing (continued...)

6

The new finding that the Board relied on in its August 12, 2008 decision was that Petitioner had, only for the first time at the August 12, 2008 hearing, "accepted the responsibility . . . for your participation in chasing the victim, for your participation in surrounding the victim, for your participation in preventing the victim's escape and for your participation and lack of assistance in helping the victim or the fact that you chose not to alert the police and also for the fact that you chose to remain a fugitive from justice for a substantial period of time."  August 12, 2008 Decision at 62.

However, Petitioner had accepted responsibility for the commitment offense at least as early as 2004, as evidenced by his December 15, 2004 letter to the Board, in which he stated, "I was a culpable part of a gathering that spawned deadly violence and I am therefore guilty of his death . . . I chose to remain part of a group of law breakers . . . My failure to act was part of a chain of causation that ended in Steven's tragic, senseless death . . . If I had left and called the police the group would have disbanded and Mr. Buus would be alive today.  I am responsible . . ."  2004 Letter at 1-2.

In the 2004 letter, Petitioner also provided an insightful explanation as why he had been previously reluctant to take responsibility for the crime:

> In order to deal with the guilt I allowed myself for a
> very long time, even up to these last months in prison,
> to take false comfort in the fact that I was not one of

---

[2](...continued)
at 63.  However, in the April 9, 2008 Order at 16, the Court noted that the Board's past findings in this regard had been inconsistent and found that Petitioner had a stable social history.

7

>     the triggermen . . . [but] the fact that I was not an
>     active participant or encourager does not really make the
>     difference that I tried to tell myself that it did. . . .
>     I am therefore guilty of his death and remorseful for
>     contributing my presence.

2004 Letter at 1.

Further, at the May 25, 2006 hearing, two years prior to the August 12, 2008 hearing, Petitioner had testified that he joined in the chase of the victim and admitted that chasing the victim was wrong. Transcript of May 25, 2006 Hearing at 60. He had also testified that he was standing in the ring of people that prevented the victim from escaping and admitted that doing so was wrong. Id. at 63. At the August 12, 2008 hearing at issue here, Petitioner similarly stated that he chased after the victim, that he was in a group of people that surrounded him, that he was part of the circle of people that prevented him from escaping, that he did nothing to stop the killing and that he was morally and legally responsible for the victim's death. Transcript of August 12, 2008 Hearing at 30-31. Any differences between Petitioner's statements at the August 12, 2008 hearing and his earlier statements at the May 25, 2006 hearing are insignificant and the result of semantic parsing of words.

At the August 12, 2008 hearing, the Board cited May 10, 1999 and November 22, 2004 psychological reports for the finding that Petitioner had "denied participation either in the beating or the death of the victim." Id. at 62-63. However, these evaluations also concluded that Petitioner's then-current level of insight and judgment regarding the commitment offense were good and supported a positive prediction of successful adaptation to community living with a violence potential of no more than the average citizen. See

8

Washburn Dec. (Docket # 36), Ex. B-1, 1999 Psychological Evaluation at 4-5; Ex. D-1, 2004 Psychological Evaluation at 2-3.  Both evaluations indicated that Petitioner felt sincere remorse for his participation in the offense, the death of the victim, and the suffering of the victim's family.[3]

The Board's continued focus on Petitioner's past denial of participating in the beating and death of the victim fails to demonstrate some evidence that Petitioner is presently a danger to the public safety if released, in light of Petitioner's long-felt remorse and his 2004 and 2006 acceptance of responsibility for causing the victim's death by chasing him, preventing him from escaping and failing to leave and summon help.

The Board also cited Dr. Starrett's 2008 opinion that Petitioner's propensity for violence is in the low to moderate range when compared to similar inmates.  However, this finding contradicts the findings in the 1999 and 2004 psychological evaluations which indicate Petitioner has a low propensity for violence.  That Petitioner was continuously involved in positive programming and education from 2004 to 2008 without any incidents that would indicate a propensity for violence makes it unreasonable to conclude that, during this time, Petitioner's propensity for violence changed for the worse.  This conclusion is supported by the July 18, 2008 psychological evaluation by Dr. Melvin Macomber who opined that Dr. Starrett had used inappropriate measures for

---

[3]The Board also relied on Dr. Starrett's April 29, 2008 psychological report which indicated that Petitioner's version of the crime was that he "followed as opposed to chased the victim in the park." However, the Court previously concluded that following the victim and chasing the victim were not necessarily inconsistent.  See April 9, 2008 Order at 15.

9

1  his risk assessment of Petitioner and thus his conclusion was
2  invalid.  Washburn Dec. (Docket # 77), Ex. C at 6.  Dr. Macomber
3  concluded that Petitioner "does not pose any more risk to society
4  than the average citizen," and that "the results of psychological
5  testing and interviewing indicate that Mr. Guardado is probably one
6  of the least dangerous people the State has."  Id. at 12-13.
7       Therefore, the Court concludes that the Board's August 12,
8  2008 decision again failed to cite some evidence that Petitioner
9  would be a danger to the public safety if released and thus failed
10 to evaluate Petitioner's suitability for parole in accordance with
11 the Court's April 9, 2008 Order.

IV. Appropriate Relief

13      Respondents argue that, should the Court determine that
14 Petitioner is entitled to relief, the proper procedure would be to
15 return the case to the executive branch for the Governor to review
16 the Board's decision rather than ordering the Board to set a
17 release date.  Respondents argue that to do otherwise would
18 deprive the Governor of his power to review the Board's decision.
19 Petitioner responds that the Governor's review is not necessary
20 because he would be reviewing the same evidence reviewed by this
21 Court.

22      The Governor has the authority to review the Board's grant,
23 denial, revocation, or suspension of the parole of an inmate
24 sentenced to an indeterminate prison term based upon a conviction
25 of murder.  Cal. Penal Code § 3041.2; Cal. Const. art. V. § 8(b).
26 When reviewing the Board's decision, the Governor shall review
27 materials provided by the Board.  Cal. Penal Code § 3041.2; Cal.
28 Const. art. V. § 8(b).  The Governor has 150 days to review the

decision to grant parole.  In re Tokhmanian, 168 Cal. App. 4th 1270, 1272-73 (2008).

The Court concludes that the Governor should have an opportunity to review the Board's finding that Petitioner is not suitable for parole, in light of this Court's opinion that the Board had no evidence upon which to base such a finding.  The cases cited by Petitioner are inapposite to Petitioner's situation.  In McQuillion v. Duncan, 342 F.3d 1012, 1015 (9th Cir. 2003), the Ninth Circuit addressed a 1994 Board's rescission hearing at which it determined whether in 1979 it had "improvidently granted" a parole date to the petitioner.  The court concluded that it was unnecessary to remand to the Board or the Governor because the evidence at the 1994 hearing pertained to the historical question of what the Board had done in 1979.  Id.  In re Smith, 109 Cal. App. 4th 489, 492 (2003), addressed the Governor's reversal of the Board's decision that the petitioner was suitable for parole.  Thus, in Smith, the Governor had already reviewed the Board's decision.  Here, the Governor has not reviewed the decision that Petitioner is suitable for parole.

Therefore, the case is remanded to the Board to submit its decision to the Governor along with this Court's April 9, 2008 Order Granting Petition For Writ of Habeas Corpus and the instant Order.  Respondents shall apprise the Court of the Governor's decision.  The Court will continue to retain jurisdiction over this petition.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Petitioner's application to enforce the writ of habeas corpus and retains

11

jurisdiction over this petition until the Governor completes his review.

IT IS SO ORDERED.

Dated: 1/22/09

*Claudia Wilken*

CLAUDIA WILKEN
United States District Judge